LEON THOMAS, Plaintiff-Appellant, v. FRANK KOE, JR., Defendant-Appellee (James P. Ginzkey, Contemnor-Appellant).—LEON THOMAS, Plaintiff-Appellant, v. FRANK KOE, JR., Defendant-Appellee.

Fourth District Nos. 4—08—0705, 4—08—0884 cons.

Opinion filed September 21, 2009.

APPLETON, J., specially concurring.

Appeal from the Circuit Court of McLean County; the Hon. Scott Drazewski, Judge, presiding.

James P. Ginzkey, of Bloomington, for appellants.

No brief filed for appellee.

JUSTICE STEIGMANN delivered the opinion of the court:

In October 2005, plaintiff, Leon Thomas, sued defendant, Frank Koe, Jr., a dentist, for malpractice, seeking damages for injuries Thomas claimed he sustained as a result of dental work that Koe performed. In August 2008, the trial court granted Koe's motion *in limine*, barring Thomas from referring to an Illinois Department of Financial and Professional Regulation (IDFPR) investigation of Koe that arose out of complaints concerning Koe's treatment of Thomas. During the September 2008 malpractice jury trial, Thomas' counsel, James P. Ginzkey, violated the trial court's order *in limine*, leading to the court's entering an order of direct criminal contempt against Ginzkey. He appeals that order (this court's case No. 4—08—0705).

That same day, the jury returned a verdict in Koe's favor. Thomas appeals (this court's case No. 4—08—0884). In December 2008, this court granted Thomas' motion to consolidate both appeals.

On appeal, Thomas argues that the trial court erred by (1) granting Koe's motion *in limine* on the ground that the IDFPR's investigation was privileged and (2) denying Thomas' motion *in limine*, in which he sought to bar Koe from introducing evidence of Thomas' preexisting injuries and conditions.

In Ginzkey's appeal, he argues that the trial court erred by finding him in direct criminal contempt.

Koe has not filed an appellee brief in either appeal.

Because Thomas' brief demonstrates *prima facie* reversible error, we reverse the judgment in Thomas' appeal and remand for further proceedings. However, because we disagree that the trial court erred by finding Ginzkey in direct criminal contempt, we affirm that judgment.

## I. BACKGROUND

### A. The Lawsuit and the Investigation of Koe

In October 2005, Thomas sued Koe, seeking damages for injuries Thomas claimed he had sustained as a result of a tooth-extraction procedure that Koe performed on him. The information the IDFPR compiled contained, in pertinent part, the following facts.

In April 2005, the IDFPR received a complaint from Thomas' brother in which he alleged that Koe had extracted Thomas' tooth but failed to (1) prescribe antibiotics before or after the extraction and (2) respond to emergency calls Thomas' brother made to Koe when Thomas realized he was becoming very ill. Because of this lack of attention, Thomas resolved to seek treatment from another dentist, who immediately had Thomas admitted to a hospital. Thomas' new doctors then diagnosed him with an infection that had become so severe he was unable to swallow and was having trouble breathing.

The IDFPR interviewed Thomas the same month it received the complaint from his brother. During this interview, Thomas explained that Koe had extracted his tooth and placed the extraction instruments into a container under his office sink, which Thomas described as dirty. In response, an IDFPR investigator went to Koe's office. After asking Koe several questions, the investigator requested to see his sterilization equipment. Koe refused and ordered the investigator to leave his office.

### B. The Motions *in Limine*

In March 2007, Thomas filed a motion *in limine*, seeking, in pertinent part, to bar Koe from presenting evidence of Thomas' preexisting injuries or conditions. The trial court did not rule on this motion, reserving judgment until trial. (The court later overruled Thomas' objection to Koe's experts' testimony regarding how Thomas' diabetes, tonsillitis, and use of alcohol could have caused Thomas' infection.)

In July 2008, Koe filed a motion *in limine*, seeking to bar Thomas from "presenting any reference to the [IDFPR] investigation" outlined above. Following a hearing on the matter, the trial court granted Koe's motion.

### C. The Circumstances That Led to the Trial Court's Direct-Criminal-Contempt Finding

During the September 2008 malpractice trial, the trial court found Ginzkey in direct criminal contempt. In the court's written order explaining that finding, which the court filed two days later, the court referred to the following exchange that took place at the parties' September 2008 trial:

"[GINZKEY:] Now [Koe], you're licensed in the State of Illinois?
[KOE:] I am.
[GINZKEY:] And that license is issued by the [IDFPR]?
[KOE:] I believe so, yes, sir.
[GINZKEY:] And that organization has the ability to inspect your office, correct?

[KOE:] They do now, but not in [20]05.

\* \* \*

[GINZKEY:] Let me rephrase it like this. Does the [IDFPR] make spot checks on dental offices?

[KOE'S COUNSEL:] Court please, I'm not sure where this is going but I don't think it's relevant to the case. So I would object. We've talked about issues of this—

THE COURT: [The court is] not sure where it's going either and \*\*\* perhaps to ferret it out we ought and should go ahead and address it outside the presence of the jury to make sure that we are not going down a road that we need not. So although [the court] realize[s] it's an inconvenience to the jurors \*\*\* accompany the bailiffs for a few minutes [un]til[ ] we explore this particular aspect.

(THE FOLLOWING PROCEEDINGS WERE OUT OF THE PRESENCE OF THE JURY.)

THE COURT: Let the record reflect that at this time the jury is outside of the courtroom. [Koe] is still on the witness stand and we wish to explore \*\*\* the line of inquiry that was commenced by Mr. Ginzkey as it would relate to the [IDFPR].

Can you respond first, Mr. Ginzkey, to the concern that \*\*\* the court has as to this line of inquiry.

GINZKEY: Yes, we can confine the line of inquiry to the fact that there was an inspector that showed up at [Koe's] office unannounced, specifically asked to inspect his sterilization process after this \*\*\* Thomas incident and in 2005. And that [Koe] would not let the inspector make the inspection.

THE COURT: [Koe's counsel]?

[KOE'S COUNSEL]: That has zero probative value. I have been pretty cool about this[.] \*\*\* I haven't said anything about it but I've had my fill of it because it's a clear breach of this court's orders time and again.

THE COURT: Any response \*\*\*?

GINZKEY: It's obviously probative. This is a raging infection that my client says may have started with reference to unsterile equipment. [Koe] has testified on direct at length about how careful he is. Yet on a spot inspection the month following this incident he refuses to let a [S]tate employee inspect \*\*\* his sterilization process. It's obvious why he didn't want that to happen.

THE COURT: No response necessary, [Koe's counsel].

[KOE'S COUNSEL]: Sorry, Your Honor, I apologize. I don't mean to lose my temper, but it was at the point where I couldn't help myself.

THE COURT: Here is what [the court] is going to do. The court has previously ruled on the inadmissibility of this line of inquiry

and/or for that matter any reference to [the IDFPR] investigations. As it relates to the ability of Mr. Ginzkey to make an offer of proof that being outside the presence of the jury as to what testimony he would have elicited from this witness were he to have been allowed to pursue that line of inquiry, that can occur at this time outside the presence of the jury. But there will be no reference previous to prior court rulings by either counsel or any witness to any ongoing investigation by the [IDFPR].

So if you wish to go ahead and examine the witness at this time *** to make an offer of proof, you may.

[GINZKEY:] Doctor, it's true is it not that an inspector from the [IDFPR] *** came to your office unannounced and specifically requested to see your sterilization procedure and you did not allow her to do so?

[KOE:] True.

[GINZKEY:] And you asked her to leave your office?

[KOE:] I did.

THE COURT: Any additional questions with respect to that line of inquiry?

[KOE'S COUNSEL]: None from the defense Your Honor, thank you.

* * *

THE COURT: All right. Are we crystal clear with respect to no reference in any way shape or form to the [IDFPR] in any way shape or form? Mr. Ginzkey?

GINZKEY: [(]No response[)].

THE COURT: [The court] wants to make sure[ ] because no sanctions have been requested nor is the court considering same at this time. But to the extent that there would be a violation of the order *in limine* the court would consider the next step if appropriate. So [the court is] making sure at this time Mr. Ginzkey that you're aware of what the court's ruling is.

GINZKEY: My hearing is fine, Your Honor.

THE COURT: All right, thank you counsel.

(THE FOLLOWING PROCEEDINGS WERE IN THE PRESENCE OF THE JURY.)

* * *

[GINZKEY:] Doctor, it's true, is it not, that an inspector asked to see your sterilization process and you refused to let her do that the month after this occurrence?

[KOE'S COUNSEL]: If the court please?

[KOE:] I don't—

THE COURT: Don't answer the question. The objection is sustained and we'll take up this matter outside the jury's presence

after they have left for the day. Please disregard the question. That is not only to the witness but to the jury.

[GINZKEY:] Doctor, didn't you write a letter and sign it saying exactly that?

[KOE'S COUNSEL]: Court please—

(THE FOLLOWING PROCEEDINGS WERE OUT OF THE PRESENCE OF THE JURY.)

THE COURT: Jury has left the courtroom. Mr. Ginzkey, you are in direct contempt of court. Do you wish to say anything?

GINZKEY: Pardon me?

THE COURT: Do you wish to say anything before the court would impose sentence?

GINZKEY: No."

The court's written contempt order levied a $500 fine against Ginzkey and explained in detail the court's rationale for its contempt finding, including the court's finding that Ginzkey's conduct, "which occurred in the presence of this court while the court was in open session, impeded and interrupted the proceedings, lessened the dignity of the court, and tended to bring the administration of justice into disrepute."

## D. The Verdict and Posttrial Filings

In September 2008, the jury returned a verdict for Koe. Shortly thereafter, Thomas filed a posttrial motion, asserting, in pertinent part, that the trial court erred by (1) quashing his subpoena for the IDFPR investigator; (2) granting Koe's motion to exclude any reference to the IDFPR's investigation; (3) not allowing him to cross-examine Koe about his refusal to allow the IDFPR to inspect his sterilization equipment; and (4) allowing Koe to present testimony of his preexisting diabetes, tonsilitis, and alcoholism. Thomas asserted that this latter ruling was contrary to the supreme court's decision in *Voykin v. Estate of DeBoer*, 192 Ill. 2d 49, 57-59, 733 N.E.2d 1275, 1279-80 (2000), which rejected the same-part-of-the-body rule and held that the proponent of the evidence of preexisting conditions must show their relevancy through expert testimony because such relevancy could no longer be assumed. In October 2008, the court denied Thomas' posttrial motion.

In December 2008, shortly after this court granted Thomas' motion to consolidate his appeal (case No. 4—08—0884) with Ginzkey's appeal (case No. 4—08—0705), this court received a letter from Koe's trial counsel that states, in part, as follows: "Koe has indicated to [us] that he does not wish to [go to] the expense of participating in th[is] [a]ppeal ***." Consistent with that letter, Koe has not filed an appellee brief in either case of this consolidated appeal.

## II. THOMAS' APPEAL

Thomas appeals, arguing that the trial court erred by (1) granting Koe's motion *in limine* to bar the IDFPR's investigation as privileged and (2) denying his motion *in limine* to bar Koe from introducing evidence of Thomas' preexisting injuries and conditions. Because Thomas' brief demonstrates *prima facie* reversible error that is supported by the record, we reverse the judgment in Thomas' appeal and remand for further proceedings.

### A. The Impact of Koe's Failure To File an Appellee Brief

In *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133, 345 N.E.2d 493, 495 (1976), the supreme court explained the options a reviewing court may exercise when an appellee fails to file a brief, as follows:

> "We do not feel that a court of review should be compelled to serve as an advocate for the appellee or that it should be required to search the record for the purpose of sustaining the judgment of the trial court. It may, however, if justice requires, do so. Also, it seems that if the record is simple and the claimed errors are such that the court can easily decide them without the aid of an appellee's brief, the court of review should decide the merits of the appeal. In other cases[,] if the appellant's brief demonstrates *prima facie* reversible error and the contentions of the brief find support in the record[,] the judgment of the trial court may be reversed."

In short, the supreme court set forth three distinct, discretionary options a reviewing court may exercise in the absence of an appellee's brief: (1) it may serve as an advocate for the appellee and decide the case when the court determines justice so requires, (2) it may decide the merits of the case if the record is simple and the issues can be easily decided without the aid of the appellee's brief, or (3) it may reverse the trial court when the appellant's brief demonstrates *prima facie* reversible error that is supported by the record. *Talandis Construction Corp.*, 63 Ill. 2d at 133, 345 N.E.2d at 495; see also *Myers v. Brantley*, 204 Ill. App. 3d 832, 833, 562 N.E.2d 355, 355-56 (1990) (describing the three discretionary options the appellate court may exercise when an appellee fails to file a brief).

As previously stated, a reviewing court may reverse the trial court when the appellant's brief demonstrates *prima facie* reversible error that is supported by the record. *Talandis Construction Corp.*, 63 Ill. 2d at 133, 345 N.E.2d at 495. *"Prima facie"* means, "[a]t first sight; on first appearance but subject to further evidence or information" and "[s]ufficient to establish a fact or raise a presumption unless disproved or rebutted." Black's Law Dictionary 1228 (8th ed. 2004); see *Talandis Construction Corp.*, 63 Ill. 2d at 132, 345 N.E.2d at 495 (similarly defining the term *prima facie*).

## B. Thomas' Claim That the Trial Court Erred by Barring the IDFPR's Investigation as Privileged

■ Thomas contends that the trial court erred by granting Koe's motion *in limine* to bar the IDFPR's investigation as privileged. Thomas further asserts that the court erroneously excluded the information garnered from the IDFPR's investigation based upon a privilege contained in sections 8—2101 through 8—2105 of the Code of Civil Procedure (735 ILCS 5/8—2101 through 8—2105 (West 2006)). Specifically, Thomas claims that (1) the privilege covers only information belonging to the organizations specifically included in section 8—2101—of which the IDFPR is not one—and (2) the purpose of the privilege is to (a) improve hospital conditions and patient care and (b) ensure effective self-evaluation for members of the medical profession—which are two aims that would not be furthered by the exclusion of the evidence in this case. After considering Thomas' contention and reviewing the record, we conclude that Thomas' brief demonstrates *prima facie* reversible error.

## C. Thomas' Claim That the Trial Court Erred by Denying His Motion To Bar Koe From Introducing Evidence of His Preexisting Injuries and Conditions

■ Thomas next argues that the trial court erred by denying his motion *in limine* to bar Koe from introducing evidence of Thomas' preexisting injuries and conditions. Specifically, Thomas contends that evidence of his preexisting injuries and conditions was inadmissible under *Voykin*, 192 Ill. 2d at 57, 733 N.E.2d at 1279, because Koe failed to show that Koe's actions did not cause *any* portion of Thomas' injuries. Our review of (1) the record and (2) Thomas' brief demonstrates *prima facie* reversible error.

## D. The Conclusion in Thomas' Appeal

Because we have concluded that Thomas' brief demonstrates *prima facie* reversible error as to both arguments he raises on appeal, pursuant to *Talandis Construction Corp.*, 63 Ill. 2d at 133, 345 N.E.2d at 495, we reverse and remand for further proceedings. In so concluding, we acknowledge that our decision puts the trial court in a difficult position. However, we emphasize that our conclusion is not a disposition on the merits. All we have concluded is that Thomas has met the *prima facie* standard discussed by the supreme court in *Talandis Construction Corp.*, 63 Ill. 2d at 133, 345 N.E.2d at 495. Although our distinguished colleague makes a strong case in his specially concurring opinion that some of the court's evidentiary rulings were erroneous, we are not reversing the judgment in Thomas' appeal because we have definitively concluded that the court erred. Doing so would be

inconsistent with the supreme court's doctrine in *Talandis*. Nonetheless, we have determined that reversal here is appropriate because (1) the record is not simple and the issues cannot easily be decided without the aid of the appellee's brief and (2) justice does not require us under these circumstances to serve as an advocate for the appellee and so decide the case.

### III. GINZKEY'S APPEAL

Ginzkey argues that the trial court erred by finding him in direct criminal contempt. Specifically, Ginzkey contends that he should not have been found in contempt because (1) his actions were in good faith and (2) he was zealously advocating his client's position.

### A. The Impact of Koe's Failure To File an Appellee Brief

Initially, we note again that Koe did not file an appellee's brief regarding Ginzkey's appeal of the trial court's order finding him in contempt. Thus, this court must analyze that appeal in accordance with the standards set forth by the supreme court in *Talandis Construction Corp.* to determine whether we should address this appeal on the merits or at all. Having done so, we conclude that because the record before us is simple and the claimed errors are such that this court can easily decide them without the aid of an appellee's brief, we will decide Ginzkey's appeal on the merits. *Talandis Construction Corp.*, 63 Ill. 2d at 133, 345 N.E.2d at 495.

### B. Direct Criminal Contempt

In *People v. Simac*, 161 Ill. 2d 297, 305-06, 641 N.E.2d 416, 420 (1994), the supreme court discussed direct criminal contempt as follows:

> "It is well established law that all courts have the inherent power to punish contempt; such power is essential to the maintenance of their authority and the administration of judicial powers. [Citation.] This court has defined criminal contempt of court ' "as conduct which is calculated to embarrass, hinder[,] or obstruct a court in its administration of justice or derogate from its authority or dignity, thereby bringing the administration of law into disrepute." ' [Citations.] A finding of criminal contempt is punitive in nature and is intended to vindicate the dignity and authority of the court. [Citation.] \*\*\*
>
> \*\*\* Direct contempt is 'strictly restricted to acts and facts seen and known by the court, and no matter resting upon opinions, conclusions, presumptions[,] or inferences should be considered.' [Citation.] \*\*\* On appeal, the standard of review for direct criminal contempt is whether there is sufficient evidence to support the finding of contempt and whether the judge considered facts outside of the judge's personal knowledge."

As this court explained in *In re Marriage of Betts*, 200 Ill. App. 3d 26, 45, 558 N.E.2d 404, 416 (1990), sanctions for criminal contempt are appropriate to ensure that (1) judges and other court officials are shown the respect to which they are entitled when performing their judicial duties, (2) judicial proceedings are conducted in an orderly fashion, (3) court orders are obeyed, and (4) individuals are not permitted to commit fraud upon the court. A party may be found in direct criminal contempt when, in the judge's presence, that party's action is disrespectful, disruptive, deceitful, or disobedient to the extent that such action affects the court's proceedings. *Betts*, 200 Ill. App. 3d at 45, 558 N.E.2d at 416.

### C. The Finding of Direct Criminal Contempt in This Case

Ginzkey contends that direct criminal contempt does not lie where the contemnor is an attorney making a good-faith attempt to represent his client. He cites two First District Appellate Court cases (*Petrakh v. Morano*, 385 Ill. App. 3d 855, 897 N.E.2d 316 (2008), and *People v. Coulter*, 228 Ill. App. 3d 1014, 594 N.E.2d 1157 (1992)) to support his claim that his actions in this case were not contemptuous but were the result of good-faith, zealous advocacy.

We agree with *Coulter* that (1) a finding of direct criminal contempt requires proof that the acts that allegedly form the basis for the contempt order were calculated to (a) embarrass, hinder, or obstruct a court in its administration of justice, (b) derogate from the court's authority or dignity, or (c) bring the administration of law into disrepute and (2) both elements of criminal contempt, an intent and an act, must be proved beyond a reasonable doubt. However, the holdings in both *Petrakh* and *Coulter* are inapposite based upon the facts of this case. To the extent those holdings could be viewed as supporting Ginzkey's claims, we respectfully—but emphatically—disagree with them.

A line must be drawn between zealous advocacy and disobeying the court, and this line must not be blurred. As Justice Cardozo once observed, "Membership in the bar is a privilege burdened with conditions." *In re Rouss*, 221 N.Y. 81, 84, 116 N.E. 782, 783 (1917). Obedience to a court's orders *in limine* is one such condition.

The record reveals that Ginzkey's actions in this case were not made in good faith. Instead, he was unhappy with the trial court's ruling regarding the admissibility of the IDFPR information and simply chose to disregard that ruling. Despite numerous admonitions from the court to desist, he continued to try to get information before the jury that the court had barred. The *best* that can be said of Ginzkey's position is that he *really* believed the court's ruling was erroneous. However, as we explain, Ginzkey's strong belief is utterly irrelevant.

Whether the trial court's underlying decision—which precipitated the contemnor's action—is "wrong" is of no consequence in contempt proceedings and, therefore, does not justify disobedient behavior. We emphasize that even when a court's decision is erroneous, the court is entitled to—and, indeed, our system of justice requires—dignity and obedience. Trial courts will occasionally make erroneous rulings, particularly in cases that involve complicated questions regarding the admissibility of evidence, like this case. However, our system of justice deals with such errors by providing for appeals. (That Ginzkey fully understands the appellate process is perhaps best shown by the very appeals he has brought to us in these consolidated cases.)

It would be intolerable to permit an attorney to disregard a trial court's ruling that the jury should not hear certain evidence by nonetheless getting that evidence before the jury because the attorney believes that the court is *really* wrong about the issue. Over 80 years ago, the Supreme Court of Illinois made this point clear in *People ex rel. Fahey v. Burr*, 316 Ill. 166, 182, 147 N.E. 47, 52 (1925), when the court wrote as follows:

> "An attorney's zeal to serve his client should never be carried to the extent of causing him to seek to accomplish his purpose by a disregard of the authority of the court ***. Unless lawyers, who are officers of the court, show respect to its orders and judgments, how can it be expected that laymen will do so?"

### D. Inferences in a Direct-Criminal-Contempt Case

■ Ginzkey also asserts that the trial court's findings in its order of adjudication of direct criminal contempt do not show beyond a reasonable doubt that his conduct "intentionally 'lessened the dignity of the court and intended to bring the administration of justice into disrepute,' as the court alleges." He also asserts that "The court seems to have inferred this intent, but direct criminal contempt cannot be based on inference." We disagree.

We first note that what the trial court wrote in its order of adjudication of direct criminal contempt constitutes *findings*, not *allegations*. Further, regarding inferences, we agree with what the Second District wrote (in the context of a direct-criminal-contempt case) in *Kaeding v. Collins*, 281 Ill. App. 3d 919, 924, 668 N.E.2d 572, 577 (1996), citing *Betts*, as follows:

> "[Respondent] first contends that he did not have the requisite mental state to support a direct criminal contempt finding because he believed his allegations to be true, and he did not intend to embarrass or obstruct the court. Criminal contempt requires that the offender have actual or constructive knowledge of what conduct is forbidden; intent or, at least, knowledge of the nature of the act is necessary. [Citation.]

There need not be a specific manifestation of contemptuous intent; rather, such intent may be inferred from the nature of the contemptuous act and surrounding circumstances."

As this court explained in *People v. Witherspoon*, 379 Ill. App. 3d 298, 307, 883 N.E.2d 725, 732 (2008), intent can rarely be proved by direct evidence because it is a state of mind. Instead, intent may be inferred from surrounding circumstances and thus may be proved by circumstantial evidence. See also *People v. Robinson*, 167 Ill. 2d 397, 408, 657 N.E.2d 1020, 1026 (1995) ("[b]ecause direct evidence of intent to deliver is rare, such intent must usually be proven by circumstantial evidence"); *In re Donald R.*, 343 Ill. App. 3d 237, 243, 796 N.E.2d 670, 675 (2003) ("[t]he *mens rea* element of a crime rarely can be proved by direct evidence"; that element ordinarily is inferred from circumstantial evidence).

In a direct-criminal-contempt case like this, the trial court is the trier of fact. That means the court, as in a bench trial, has the responsibility to determine the credibility of witnesses, weigh evidence, draw reasonable inferences therefrom, and resolve conflicts in the evidence. *People v. Vasser*, 331 Ill. App. 3d 675, 688, 770 N.E.2d 1194, 1205 (2002). Further, as explained by the First District in *People v. Austin*, 328 Ill. App. 3d 798, 804, 767 N.E.2d 433, 440 (2002), reviewing courts should give great deference to trial courts when they hear evidence and observe witnesses. To the same effect is the decision of the Supreme Court of Illinois in *Samour, Inc. v. Board of Education Commissioners of Chicago*, 224 Ill. 2d 530, 548-49, 866 N.E.2d 137, 148 (2007).

## E. The Conclusion in Ginzkey's Appeal

Consistent with the forgoing authority, we conclude that the trial court's inference regarding Ginzkey's intent was entirely reasonable and not contrary to the manifest weight of the evidence.

Judged further in accordance with the appropriate standard of review set forth by the supreme court in *Simac*, we conclude that (1) the record contains sufficient evidence to support the trial court's finding of direct criminal contempt against Ginzkey and (2) the trial court did not consider facts outside of the court's personal knowledge.

## IV. CONCLUSION

For the reasons stated, we reverse the judgment in Thomas' appeal (case No. 4—08—0884) and remand for further proceedings. We affirm the trial court's judgment as to Ginzkey's appeal (case No. 4—08—0705).

No. 4—08—0884—Judgment reversed and cause remanded for further proceedings.

No. 4—08—0705—Judgment affirmed.

POPE, J., concurs.

JUSTICE APPLETON, specially concurring:

While I concur with the majority's decision, I write separately to express my opinion that while a finding of *prima facie* reversible error is all *Talandis Construction Corp.* allows us to accomplish in this appeal, such a finding gives little or no direction to the trial court on remand.

As to the *in limine* order barring plaintiff from introducing evidence of the IDFPR investigation, I would find no basis exists to bar the investigating files of the IDFPR. The privilege stated in section 8—2101 of the Code of Civil Procedure (735 ILCS 5/8—2101 (West 2006)) sets forth with great specificity the information barred from use as evidence as "[a]ll information, interviews, reports, statements, memoranda, recommendations, letters of reference, or other third party confidential assessments of a health care practitioner's professional competence, or other data" collected by entities enumerated in section 8—2101. While the Illinois Department of Public Health and the Illinois Department of Human Services are listed as agencies covered by the Code, the IDFPR is not. Moreover, the evidence of defendant's refusal to show the IDFPR's investigator his autoclave and his ejection of the investigator from his office has nothing to do with the subject matter of an assessment of medical (dental) competence. It is evidence only of defendant's unwillingness to be investigated and is admissible as a statement against interest.

For the foregoing reasons, had I not been constrained by the procedures set forth in *Talandis Construction Corp.*, I would have reversed the judgment of the trial court entered on the verdict and remanded for a new trial with directions to admit the evidence obtained by the IDFPR.